Jerold Oshinsky (joshinsky@kasowitz.com)
Christian T. Becker (cbecker@kasowitz.com)
Jeffrey Ephraim Glatt (jglatt@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Facsimile: (212) 506-1800

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X
                                                           :
NATIONAL HEALTHCARE ASSOCIATES,                            :
INC.,                                                      :
                                                           :
              Plaintiff,                                   :
                                                           :   Case No.: 17-cv-6823
       v.                                                  :
                                                           :
LIBERTY MUTUAL INSURANCE                                   :
COMPANY; ARCH INSURANCE COMPANY;                           :
PRISM CONSULTANTS, LLC; ASHER                              :
SCHOOR and ETTIE SCHOOR,                                   :
                                                           :
              Defendants.                                  :
---------------------------------------------------------- X

## COMPLAINT

Plaintiff NATIONAL HEALTHCARE ASSOCIATES, INC. ("NHA") and its affiliates (together with NHA, the "NHA Entities") bring this complaint against defendants LIBERTY MUTUAL INSURANCE COMPANY ("LMIC"), ARCH INSURANCE COMPANY ("Arch") PRISM CONSULTANTS, LLC ("Prism"), ASHER SCHOOR, and ETTIE SCHOOR (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      NHA seeks damages based upon the unlawful and deceptive acts of Defendants in connection with certain insurance-related services rendered by Defendants, including intentional

or negligent misrepresentations and omissions made by the Defendants to NHA in connection with NHA's purchase of securities, as well as breaches of contract and fiduciary duties.

2.      Defendants' many intentional or negligent misrepresentations and omissions induced NHA to participate to its detriment in various alternative workers' compensation insurance programs, which paired traditional, highly-regulated "guaranteed cost" workers' compensation insurance policies issued first by LMIC from 2004 to 2008, then by Arch from 2008 to 2015, with unregulated captive reinsurance agreements (the "Programs").

3.      Defendants intentionally or negligently misrepresented that as part of the Programs, NHA would receive ownership interests in and rights to profits of Rent-a-Captives[1] and their related segregated reinsurance cells, which Defendants promised would only insure risks from NHA Entities.  Relying on Defendants' misrepresentations, NHA provided tens of millions of dollars in irrevocable capital contributions to support the segregated reinsurance cells, paid monthly multi-million dollar "premiums and fees" far in excess of prevailing insurance market rates, and became exposed to significant ongoing risks and liabilities of third parties wholly outside NHA's control.

4.      Defendants also, either purposefully or negligently, failed to submit the Programs' captive reinsurance agreements for approval by the New York Department of Financial Services in violation of New York insurance laws.  Defendants' failure to submit these agreements for regulatory   review   effectively   concealed   their   misconduct,   allowing   Defendants'

---

[1] An arrangement in which a captive insurer "rents" its facilities to an outside organization, thereby providing the benefits that captives offer without the financial and managerial commitments that captives require.  In return for a fee (usually a percentage of the premium paid by the renter), certain captives agree to provide underwriting, rating, claims management, accounting, reinsurance, and financial expertise to the outside organization.

misrepresentations and omissions to go undiscovered by NHA and state regulators for many years.

5.       Upon information and belief, as a result of Defendants' actions, to date NHA has incurred many millions in damages, including damages involving at least $12,897,000.23 in irrevocable letters of credit, and additional damages in the form of unjustly-obtained fees and wrongfully-withheld profits.  Moreover, with each passing day, NHA will accrue additional damages due to the Programs.

6.       Moreover, upon information and belief, Defendants have refused to provide all of the relevant documents to NHA, despite NHA's repeated requests, and thereby continue their unlawful scheme.

## PARTIES

7.       Plaintiff NHA is a Connecticut corporation with its principal place of business at 20 East Sunrise Highway, Valley Stream, New York 11581.

8.       Defendant LMIC is a Massachusetts corporation with its principal place of business at 175 Berkeley Street, Boston, Massachusetts 02116.  At all relevant times, LMIC was doing business in the State of New York as an insurer issuing workers' compensation insurance.

9.       Defendant Arch is a Missouri corporation with its principal place of business at Harborside 3, 210 Hudson Street, Suite 300, Jersey City, New Jersey 07311. At all relevant times, Arch was doing business in the State of New York as an insurer issuing workers' compensation insurance.

10.      Defendant Prism is a New York limited liability company with its principal place of business at 85 Spruce Street, Cedarhurst, New York 11516.

11.     Upon information and belief, Defendant Asher Schoor is the CEO of Prism and resides in the County of Queens, New York.

12.     Upon information and belief, Defendant Ettie Schoor a/k/a Ettie Feuer is the President of Prism and resides in the County of Queens, New York.

13.     All of the Defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' various officers, agents, employees, or other representatives in pursuance of Defendants' common scheme, and within the course and scope of their duties and employment, and/or with the actual, apparent and/or ostensible authority of each Defendant.

14.     At all relevant times, the respective Defendants were agents and representatives of, and aided and abetted the unlawful conduct of, each of the other Defendants in a common scheme.  In doing the things alleged herein, each and every Defendant was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other respective Defendants.  All actions of each Defendant as alleged herein were ratified and/or approved by the other respective Defendants.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, based on Plaintiff's claim for damages under Section 10(b) of the Exchange Act.  This Court has jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

16.     This Court has personal jurisdiction over LMIC and Arch because (a) both Insurers are authorized to sell, issue or otherwise underwrite insurance policies in New York, (b) LMIC and Arch have conducted continuous and substantial business in the State of New York, and (c) the conduct complained of occurred, in whole or in part, in New York.

17.     This Court has personal jurisdiction over Prism because it is a New York limited liability company with its principal place of business in New York, because Prism has an office and conducts continuous and substantial business in New York, and because the conduct complained of occurred, in whole or in part, in New York.

18.     This Court has personal jurisdiction over Asher Schoor and Ettie Schoor because they reside in New York, and because the conduct complained of occurred, in whole or in part, in New York.

19.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3), because a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of New York, and because LMIC and Arch have offices and conduct continuous and substantial business within the Southern District of New York.

## FACTUAL BACKGROUND

### I.     Prism and the Schoors Agree To Provide Comprehensive Claims Management Services

20.     Starting in or around 1997, Prism entered into Customer Agreements with many NHA Entities, in which Prism agreed to provide "comprehensive claims management services on a regular basis" to the NHA Entity that was signatory to that respective agreement.

21.     In exchange for its services, Prism was to be paid a yearly fee that varied depending on the respective NHA Entity that was signatory to that agreement, but that was often in the amount of thousands of dollars.

22.     Pursuant to the terms of the Customer Agreements, the agreement "shall automatically be renewed yearly" unless either party terminated the agreement upon thirty days' written notice or upon an Event of Default as defined therein.

5

23.     Upon information and belief, Prism never terminated the agreement.

24.     According to Prism's website, as part of its standard "managing claims" responsibilities, Prism provides the insured with "[s]emi-annual status reports detailing status of all claims and actions that can be taken to improve future experience," as well as "[p]rovide robust reporting, including aggregate claim performance and activity tracking and weekly claims performance reports."

25.     Additionally, Prism's website touts that "Key Performance Measures" of its services are the "Accuracy of reserves," the "Claims outstanding at 1 month, 3, 6 and 9 months," and "Total loss experience and loss development factors."

26.     Yet, Prism and the Schoors have not fully and adequately performed their obligations under the Customer Agreements, and have breached the agreements.

27.     Specifically, and as set forth further herein, Prism and the Schoors have not provided NHA with all relevant documents and/or reports regarding claims against NHA, nor have they helped NHA decrease its premium costs and total loss experience.

28.     On the contrary, Prism and the Schoors, on behalf of LMIC and Arch, have orchestrated an unlawful scheme that has cost NHA millions of dollars in premiums and letters of credit, as set forth further herein.

## II.     Defendants Propose Alternative Workers' Compensation Insurance Program to Plaintiff

29.     In 2003, pursuant to the Customer Agreements, NHA engaged Prism as an insurance intermediary to assist NHA with its search for workers' compensation insurance policies for the NHA Entities.

30.     NHA was unaware, however, that Prism was in fact acting as a representative for and in the best interests of the Insurers—first LMIC, and later Arch—not NHA and the NHA Entities.

31.     Asher Schoor and Ettie Schoor (respectively CEO and President of Prism) were the primary correspondents for the Defendants at all relevant times.

32.     In early 2003, Defendants Asher and Ettie Schoor brought to NHA's attention alternative insurance programs that, according to them, utilized a beneficial captive reinsurance structure.  Defendant Asher Schoor represented that while the "rent-a-captive" would be initially funded by the NHA Entities, over time it would save the NHA Entities money as the NHA Entities acquired profit-sharing interests in the captive and its underlying program cells.

33.     Because NHA previously suffered a negative experience in pooling its insurance risks with other third parties in an earlier workers' compensation program, NHA informed Asher and Ettie Schoor that NHA only would be interested in an alternative insurance program if NHA would be able to fully control the risk of the entire reinsurance structure by being the only participant (along with its affiliated companies, the NHA Entities). Indeed, when the Schoors requested that NHA join with other entities in a large structure to pool risks, NHA informed the Schoors that it was not interested in pooling its capital or risk with any unaffiliated third parties.

34.     Thereafter, in 2004, Defendants presented to NHA an alternative risk insurance program for workers' compensation insurance offered by LMIC, which supposedly provided "guaranteed cost" workers' compensation insurance policies to the NHA Entities and purportedly conformed to LMIC's ratings plan for each state in which the NHA Entities were operating.

35.     On or about November 8, 2004, Prism e-mailed to NHA a proposal titled "Designing the optimal workers compensation solution – National Health Associates" (the "Proposal"). The Proposal served as the primary document for discussions between NHA and Defendants Prism, Asher and Ettie Schoor.  Upon information and belief, the Proposal was put together by Prism directly in conjunction with LMIC, or with LMIC's knowledge and acquiescence.

36.     In the Proposal, Prism promised the NHA Entities that they would not only "be covered with real insurance," but also that they would enjoy profits with little risk. For example, Prism touted to NHA that it could "get back almost 400% more than it would with" its previous insurer, and that "while there is tremendous likely upside the downside is limited."

37.     Prism's Proposal specifically called for the establishment of a captive insurance company, Comp Control, LLC ("Comp Control"), which would distribute "profits to LLC members based on profitability formula" and be "[o]wned by program participants."

38.     Any "[u]nderwriting profits + interest" of Comp Control would be "[c]alculated for each account individual based on the amount of cash collateral invested."

39.     The Proposal showed the members for Comp Control, LLC to be solely "[a]ffliates of National HealthCare Associates."   Indeed, throughout the entire Proposal, the NHA Entities are listed as the only program participants.

40.     As part of this LMIC W/C Program, LMIC-sponsored Arlington Insurance Company SAC, Ltd of Bermuda ("Arlington"), which would reinsure the NHA Entities' workers' compensation insurance policies up to a per-occurrence and aggregate threshold through a Rent-a-Captive facility, and would also provide the following benefit: If the ultimate loss ratio for the premiums collected was below a 60% threshold, the underwriting profit would

be returned to NHA via Comp Control.  In exchange, LMIC would require the captive to provide collateral up to a stated aggregate limit.

41.     The final page of the Proposal provided an overview of the LMIC W/C Program using a diagram pulled directly from LMIC's webpage.  In it, LMIC and Prism promised that premiums would be "invested," and that "at periodic intervals," NHA could expect "dividends . . . consisting of underwriting profits and investment income earned."

42.     In subsequent communications, Prism and the Schoors also represented to NHA that NHA would be the sole non-voting shareholder in Arlington for a dedicated segregated account, Cell #45 (the "Arlington Cell"), which would facilitate the return of underwriting profits to NHA.

43.     On November 24, 2004, on behalf of Prism, Asher Schoor e-mailed to NHA a draft operating and collateral agreement for the rent-a-captive "Comp Control, LLC" (the "Comp Control Operating Agreement").

44.     The Comp Control Operating Agreement reflected that the members of "Comp Control, LLC" would contribute capital to the reinsurance captive and in exchange would receive "distributions of cash flow" and "allocations of profit", including both profits from the captive and general profits of the enterprise.

45.     Prism, through its President and agent Asher Schoor, represented to NHA that NHA would be the sole member in the final Comp Control Operating Agreement.

46.     However, upon information and belief, Prism and the Schoors intentionally (or at a minimum, recklessly) left blank the Exhibit A to the Comp Control Operating Agreement— which would have listed the "Initial Cash Capital Contributions" of the members that would

determine the profit-sharing under the arrangement—in order to hide from NHA the fact that none of the NHA Entities were in fact members of Comp Control.

**III.** **Defendants Induce Plaintiff to Participate in the LMIC W/C Program Under False Pretenses**

47.    Prism and its representatives Asher and Ettie Schoor held themselves out as representing NHA's interests, and as being trusted experts in alternative insurance plans, especially insured profit-sharing structures like the LMIC W/C Program.  The principals of NHA also knew the Schoors personally for many years, having belonged to the same religious community in New York; indeed, the principals of NHA believed the Schoors to be friends of theirs.  NHA therefore reasonably believed that Prism and the Schoors accurately were describing the Program and NHA's future profit-sharing interest.

48.    Relying on Prism's and the Schoors' representations, NHA agreed to enter into the LMIC W/C Program.  At Prism's and the Schoors' direction, NHA purchased and relinquished to Prism millions of dollars in Letters of Credit to provide collateral support for Comp Control and the Arlington Cell.  NHA began making monthly payments to Prism for insurance premiums to LMIC and reinsurance premiums ceded by LMIC to Arlington, Prism's fees, and other fees for management and operation of the LMIC W/C Program, Comp Control, and the Arlington Cell.

49.    Upon information and belief, Prism and/or Comp Control executed several insurance and reinsurance agreements with LMIC and Arlington on behalf of the NHA Entities.

50.    NHA believed it was the sole member of Comp Control, LLC, but upon information and belief, NHA never was made a member of Comp Control, LLC, let alone the sole member.

51.     Prism and the Schoors never provided to NHA a fully-executed copy of the Comp Control Operating Agreement; nor did they provide to NHA a copy of the completed Exhibit A to the Comp Control Operating Agreement which would have listed the membership interests in the reinsurance captive.

52.     In 2005, during a renewal of this program, Prism and the Schoors induced NHA to agree to become an owner in a cell within a new captive insurance company, Comp Control Insurance Company SPC of the Cayman Islands ("CCIC"), which would have segregated accounts for the workers' compensation reinsurance risks assumed from the NHA Entities.

53.     Prism and the Schoors represented to NHA that as a result of NHA's ownership in CCIC, NHA would receive underwriting profits if the loss ratio for the reinsurance was below a certain threshold.

54.     Relying on these representations, NHA agreed to have LMIC cease ceding to Arlington a portion of the NHA Entities' risk under the LMIC W/C Program and instead begin ceding that risk to a cell established in the CCIC, Comp Control #100 ("CCIC Cell #100").

55.     Defendants Prism and the Schoors also induced NHA to procure various Letters of Credit worth millions of dollars from M&T Bank for the accounts of the NHA Entities for the benefit of The Bank of New York Mellon, as trustee for CCIC Cell #100, to provide collateral for the reinsurance obligations CCIC owed to Arlington.  The CCIC Cell #100 assumed the second, third, and fourth years of the LMIC W/C Program that was originally supported through Arlington and the Arlington Cell.

56.     In 2009, Prism provided NHA with a document titled "Review of Captive Performance," providing an overview of Comp Control's accounting for the years 2005, 2006, 2007, and 2008, and representing that NHA was entitled to profits under the arrangement.

Specifically, Prism misrepresented to NHA that "captive performance has been extremely positive for the last couple of years" and "[t]here is approximately another $1MM in embedded profits from the earlier years."

57.     Prism also misrepresented that CCIC Cell #100 had a then current profit of $5 million and an additional $10 million in a loss fund.

58.     Subsequently, in August 2009, Asher Schoor also represented that he would be able to get a minimum of 1 million dollars released to NHA by November 2009.

59.     Since the inception of the LMIC W/C Program, LMIC, through its agent Prism, has billed and collected from Plaintiff the guaranteed cost premiums due under the workers' compensation insurance policies issued by LMIC to the NHA Entities.  Additionally, LMIC has allowed Prism to wrongfully and deceitfully bill and collect from Plaintiff millions of dollars which Prism represented to Plaintiff were for the purpose of Prism's making, on the behalf of and as agent for Plaintiff, capital contributions to the CCIC Cell as if NHA or one of its affiliates were the owner of the CCIC Cell.

60.     On March 15, 2016, after an investigation and repeated inquiries by NHA, NHA learned for the first time that apparently neither NHA nor any of the NHA Entities owned any equity in or otherwise have any rights to receive any net profits of any of the LLC cells -- Comp Control, Arlington Cell, CCIC, and/or CCIC Cell #100 (collectively, the "Captive LLC Cells").

61.     Accordingly, NHA more recently become aware that Defendants Prism and the Schoors have perpetrated a fraud on and/or breached their fiduciary duties to the NHA Entities by misrepresenting, either intentionally or at the very least, negligently, to the NHA Entities that they had ownership interests in the Captive LLC Cells.

62.     Moreover, some of the amounts that Prism has reported to, and billed and collected from, NHA as having been owed by NHA under the LMIC W/C Program do not relate to workers' compensation insurance risks of the NHA Entities, but rather to other insureds that are not affiliated with NHA or any of the NHA Entities.  Additionally, some of the amounts have been used for other purposes besides from paying claims, such as financing the reinsurance scheme.

63.     After NHA obtained copies of the LMIC loss runs in November 2015, which revealed to NHA for the first time that it was apparently being held responsible for claims made by organizations unaffiliated with NHA, NHA confronted Asher Schoor with the LMIC loss runs.

64.     Even in the face of this evidence, Asher Schoor responded to NHA's inquiries by continuing to deny that Prism billed NHA for amounts attributable to risks associated with third parties under the LMIC W/C Program, and stating: "National is paying for their own claims."

65.     Furthermore, upon information and belief, LMIC (in conjunction with Prism and/or CCIC), over the last two years, has continuously and wrongfully drawn on the Letters of Credit purchased and provided by NHA, despite the fact that LMIC, Prism and CCIC lack the proper authority to exercise said rights over those instruments.

66.     Indeed, LMIC has consistently refused to provide any explanation for these drawdowns, despite NHA's repeated requests.

## IV.     Defendants Induce Plaintiff to Participate in the Arch W/C Program Under False Pretenses

67.     In 2008, LMIC declined to renew the workers' compensation insurance policies it issued to the NHA Entities.  As a result, Prism, through its representative and President, Asher Schoor, presented to NHA another alternative risk insurance program for workers' compensation

coverage, similar to the LMIC W/C Program, which offered to provide guaranteed cost insurance policies from Arch to the NHA Entities, reinsuring the NHA Entities' policies up to a per-occurrence and aggregate threshold through a rent a captive facility (the "Arch W/C Program").

68.     Defendants Prism and Asher Schoor represented to NHA that the reinsurance structure of the Arch W/C Program would mirror the LMIC W/C Program where NHA would be an owner in a cell within a captive insurance company, CCIC, which would have segregated accounts for the workers' compensation reinsurance risks assumed from the NHA Entities.

69.     Defendants Prism and Asher Schoor represented to NHA that as a result of NHA's ownership in CCIC, NHA would receive underwriting profits if the ultimate loss ratio for assumed reinsurance was below a certain threshold.

70.     Relying on these representations, NHA agreed to accept the Arch W/C Program. A new segregated account, Comp Control #400 (the "CCIC Cell #400"), was established to assume the risk ceded by Arch under the program.

71.     The first year guaranteed cost premiums totaled approximately $7.8 million.

72.     In addition, at the direction of Prism and Asher Schoor, NHA purchased and provided millions of dollars in the form of Letters of Credit to support CCIC's assumed risk.

73.     At the direction of Prism and Asher Schoor, NHA began making monthly payments to Prism for premiums to Arch, Prism's fees, and other fees for management and operation of the Arch W/C Program, CCICC, and the CCIC Cell #400.

74.     Upon information and belief, Prism and/or Comp Control executed several insurance and reinsurance agreements with Arch.

75.     In addition, at the direction of Prism and Asher Schoor, NHA entered into a Corporate Guarantee Agreement for all facilities covered under the Arch agreements.

76.     In or about April 2010, Prism represented to NHA that the program "has been extremely profitable on a program basis sitting at a current surplus of over $3MM since 2005 at Liberty and current" and "[NHA] has 2.2MM of collateral pledged and an estimated ultimate profit of $2MM".

77.     Since the inception of the Arch W/C Program, Arch (through its agent Prism) has billed and collected from Plaintiff not only the guaranteed cost premiums and audits due under the workers' compensation insurance policies issued by Arch to the NHA Entities, but Arch has also allowed Prism to wrongfully and deceitfully induce Plaintiff to post capital contributions in the form of Letters of Credit to the CCIC Cell #400 as if NHA or one of its affiliates were the owner of the CCIC Cell #400.

78.     Arch was a direct and active participant in this deceitful scheme.  Indeed, on January 9, 2015, Arch sent correspondence directly to NHA setting forth the terms and conditions for Comp Control SPC #400, further lending an air of credibility to the entire Program.

79.     However, as described above, NHA learned in 2016 that neither NHA nor the NHA Entities owned any equity in or otherwise have any rights to receive any net profits of CCIC or its reinsurance cells, despite representations by Defendants Prism and Asher Schoor to the contrary.

80.     Furthermore, upon information and belief, Arch (in conjunction with Prism and/or CCIC), over the last two years, has continuously and wrongfully drawn on the Letters of Credit purchased and provided by NHA, despite the fact that Arch, Prism and CCIC lack the proper authority to exercise said rights over those instruments.

81.     Indeed, Arch has consistently refused to provide any explanation for these drawdowns, despite NHA's repeated requests.

**V.      Defendants Concealed Their Fraudulent Scheme by Failing to Comply with New York Insurance Laws**

82.     Defendants intentionally or negligently failed to submit the Programs' captive reinsurance agreements for approval by the New York Department of Financial Services as required by New York insurance laws.  See N.Y. Ins. Law §§ 2314, 2339.  Defendants' failure to submit these agreements for regulatory review violated N.Y. Ins. Law, and allowed Defendants' misconduct to go undiscovered by Plaintiff and state regulators for many years.

83.     Defendants' unlawful scheme involved their offer for sale of traditional "guaranteed cost" workers' compensation insurance policies issued by LMIC and Arch.  On their face, these policies appeared to have been issued in compliance with New York State's regulatory requirements.

84.     This appearance was deceptive, however, as Defendants also required NHA to simultaneously enter into unfiled and unapproved captive reinsurance agreements that Defendants led NHA to believe would give the NHA Entities ownership interests in the Captive LLC Cells and would allow them to share in underwriting profits.

85.     However, not only did the NHA Entities have no ownership interest in the Captive LLC Cells, the NHA Entities were obligated to pay amounts far in excess of the approved "guaranteed cost" premiums.

86.     Moreover, as a result of Defendants' intentional or negligent misrepresentations or omissions, the NHA Entities also became liable not only for their own risks, but also the risks of third parties beyond NHA's control.

87.     Had Defendants sought approval from the New York Department of Financial Services for these captive reinsurance agreements, as they were required to do, Defendants' fraudulent scheme would have been uncovered much sooner.

88.     Moreover, Defendants' unlawful scheme to modify and/or replace approved workers' compensation insurance premium rates and policy forms with unapproved and unlawful terms and conditions has resulted in NHA being required to pay substantially more for their insurance than they otherwise would have been required to pay under their guaranteed cost workers' compensation insurance policies.

89.     Indeed, similar workers' compensation insurance schemes, where insureds are led to believe that their premiums and capital contributions are being paid into protected cells, to be paid back to the insureds in the form of discounted workers' compensation insurance, underwriting profits, and other rewards for low incurred losses, have been found to be grossly misleading if not out-right illegal by this court.  *See Natl. Convention Services, L.L.C. v. Applied Underwriters Captive Risk Assur. Co., Inc.*, 15-CV-07063 (JGK), 2017 WL 945189 (S.D.N.Y. Mar. 9, 2017) (Koeltl, J.).

## VI.     <u>Defendants Have Consistently Refused To Provide NHA With Necessary Agreements And Documents</u>

90.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA a fully-executed copy of the Operating Agreement for any of the reinsurance captives.

91.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA financial statements for all of the reinsurance captives.

92.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA all relevant information or documents regarding the profitability of the reinsurance captives.

93.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA all relevant information or documents regarding the loss runs and claims paid by the reinsurance captives.

94.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA all relevant information or documents regarding the remaining claims still needed to be paid by the reinsurance captives.

95.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA all relevant information or documents regarding the ownership of the reinsurance captives.

96.     Upon information and belief, despite repeated requests by NHA, Defendants have never provided to NHA all relevant information or documents regarding the amount of loss reserves held by the reinsurance captives.

97.     Indeed, despite repeated requests by NHA for an accounting, Defendants have consistently refused to answer NHA's questions, and have continued to evade NHA and conceal their unlawful scheme.

**FIRST CLAIM FOR RELIEF:**
**SECURITIES FRAUD**
**(Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and**
**Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5))**
**(All Defendants)**

98.     Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

99.     Purported ownership interest in a limited liability company and/or participation in a profit-sharing agreement are "securities" as defined by 15 U.S. Code § 78c.  The sale of, or offer to sell, these securities triggered Prism's obligations under Federal securities laws and regulations.

100.    Prism, LMIC and Arch, acting through their agents, the Schoors, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff in an effort to pocket funds received from and use collateral provided by Plaintiff for the specific purpose of acquiring securities in the Captive LLC Cells in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

101.    Specifically, as alleged above, the Schoors made untrue statements of a material fact to Plaintiff: that Plaintiff would receive an ownership interest in the Captive LLC Cells or otherwise enter a profit-sharing arrangement as a part of the Programs.

102.    Alternatively, the Schoors omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading in connection with the sale of securities: that Plaintiff would not receive an ownership interest in the Captive LLC Cells or otherwise enter a profit-sharing arrangement as a part of the Programs.

103.    Defendants knew such fraudulent statements and/or omissions would likely induce Plaintiff to enter the Programs and pay, and continue to pay, tens of millions of dollars in premiums, fees, and collateral support for the Captive LLC Cells, for the ultimate benefit of the Defendants.

104.    Defendants used the U.S. Mail, telephone, and internet via email in connection with this offer to sell securities.

105.    Plaintiff was justified in relying on Defendants false statements and/or omissions of a material fact that NHA was acquiring ownership interests in the Captive LLC Cells or otherwise entering a profit-sharing arrangement as a part of the Programs, because (a) the Schoors held themselves out as representing the interests of Plaintiff (when in fact they were acting in their own interests, as well as the interests of Prism, LMIC, and Arch; (b) the principals of NHA belonged to the same religious and cultural community as the Schoors, and indeed considered them to be good friends; (c) the Schoors held themselves out as being trusted experts in alternative insurance plans, especially insured profit-sharing structures like the Programs; and (d) LMIC and Arch further leant credibility to the Programs, both by their participation and by allowing Prism and the Schoors to bill on their behalf and use their names (and sometimes even their letterhead) in written materials concerning the Programs.

106.    Plaintiff justifiably relied on Defendants' intentional or negligent misrepresentations and/or omissions and thereby entered into the LMIC W/C Programs and Arch W/C Program, purchasing tens of millions of Letters of Credit to support the Captive LLC Cells, providing those letters of credit to Prism, providing Corporate Guarantee Agreements, and paying significant monthly premiums directly to Prism based on invoices submitted by Prism, all upon the belief Plaintiff was purchasing ownership interests in the Captive LLC Cells or otherwise entering a profit-sharing arrangement.

107.    Moreover, Defendants' purposeful or negligent failure to submit the Programs for regulatory review meant that neither the Plaintiff nor state regulators discovered the fraudulent scheme for many years.

108.    Defendants' intentional and/or negligent misrepresentations and/or omissions caused Plaintiff to potentially suffer tens of millions of dollars in damages, including millions of dollars used to purchase irrevocable letters of credit, monthly multi-million dollar "premiums and fees" far in excess of market rates, and exposure to significant ongoing liabilities contingent on actions by third parties.

109.    Accordingly, Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and NHA is entitled to damages for its losses an amount to be determined at trial, but believed to be at least $12,897,000.23.

## SECOND CLAIM FOR RELIEF: INTENTIONAL MISREPRESENTATION (All Defendants)

110.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

111.    As alleged above, Defendants Prism, Asher Schoor and Ettie Schoor made untrue statements of a material fact to Plaintiff (for their own benefit and the benefit of Arch and LMIC): that Plaintiff would receive an ownership interest in the Captive LLC Cells or otherwise enter a profit-sharing arrangement as a part of the Programs.

112.    Alternatively, Defendants Prism, Asher Schoor and Ettie Schoor omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading (for their own benefit and the benefit of Arch and LMIC): that Plaintiff would not receive an ownership interest in the Captive LLC Cells or otherwise enter a profit-sharing arrangement as a part of the Programs.

113.   Defendants Prism, Asher Schoor and Ettie Schoor acted knowingly in so doing, and knew such fraudulent statements and/or omissions would likely induce Plaintiff to enter the Programs and pay, and continue to pay, tens of millions of dollars in premiums, fees, and collateral support for the Captive LLC Cells, for the ultimate benefit of Defendants.

114.   Plaintiff was justified in relying on these Defendants and their false statements and/or omissions of material facts that Plaintiff were acquiring ownership interests in the Captive LLC Cells or otherwise entering a profit-sharing arrangement as a part of the Programs, because (a) the Schoors held themselves out as representing the interests of Plaintiff (when in fact they were acting in their own interests, as well as the interests of Prism, LMIC, and Arch); (b) the principals of NHA belonged to the same religious and cultural community as the Schoors, and indeed considered them to be good friends; (c) Prism and the Schoors held themselves out  as being trusted experts in alternative insurance plans, especially insured profit-sharing structures like the Programs; and (d) LMIC and Arch further leant credibility to the Programs, both by their participation and by allowing Prism and the Schoors to bill on their behalf and use their names (and sometimes even their letterhead) in written materials concerning the Programs.

115.   Plaintiff relied on these Defendants' fraudulent representations and omissions and thereby entered into the LMIC W/C Programs and Arch W/C Program, purchasing tens of millions of Letters of Credit to support the Captive LLC Cells, providing those letters of credit to Prism, providing Corporate Guarantee Agreements, and paying significant monthly premiums directly to Prism based on invoices submitted by Prism, all upon the incorrect belief that Plaintiff was purchasing ownership interests in the Captive LLC Cells or otherwise entering a profit-sharing arrangement.

116.    Defendants' intentional misrepresentations and/or omissions caused Plaintiff to potentially suffer tens of millions of dollars in damages, including millions of dollars used to purchase irrevocable letters of credit, monthly multi-million dollar "premiums and fees" far in excess of market rates, and exposure to significant ongoing liabilities contingent on actions by third parties.

117.    Accordingly, these Defendants' fraud against NHA has caused Plaintiff to be damaged in an amount to be determined at trial, but believed to be at least $12,897,000.23.

**THIRD CLAIM FOR RELIEF:**
**NEGLIGENT MISREPRESENTATION**
**(All Defendants)**

118.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

119.    As alleged above, Defendants Prism, Asher Schoor and Ettie Schoor made untrue statements of a material fact to Plaintiff (for their own benefit and the benefit of Arch and LMIC): that Plaintiff would receive an ownership interest in the Captive LLC Cells or otherwise enter a profit-sharing arrangement as a part of the Programs.

120.    Alternatively, Defendants Prism, Asher Schoor and Ettie Schoor omitted a material fact necessary under the circumstances to keep the statements that were made from being misleading (for their own benefit and the benefit of Arch and LMIC): that Plaintiff would not receive an ownership interest in the Captive LLC Cells or otherwise enter a profit-sharing arrangement as a part of the Programs.

121.    Defendants Prism, Asher Schoor and Ettie Schoor acted negligently or recklessly in so doing, without regard to whether their statements and/or omissions were true, but with the knowledge that these statements would likely induce Plaintiff to enter the Programs and pay, and

continue to pay, tens of millions of dollars in premiums, fees, and collateral support for the Captive LLC Cells, for the ultimate benefit of Defendants.

122.    Plaintiff was justified in relying on these Defendants and their false statements and/or omissions of material facts that Plaintiff was acquiring ownership interests in the Captive LLC Cells or otherwise entering a profit-sharing arrangement as a part of the Programs, because (a) the Schoors held themselves out as representing the interests of Plaintiff (when in fact they were acting in their own interests, as well as the interests of Prism, LMIC, and Arch); (b) the principals of NHA belonged to the same religious and cultural community as the Schoors, and indeed considered them to be good friends; (c) Prism and the Schoors held themselves out  as being trusted experts in alternative insurance plans, especially insured profit-sharing structures like the Programs; and (d) LMIC and Arch further leant credibility to the Programs, both by their participation and by allowing Prism and the Schoors to bill on their behalf and use their names (and sometimes even their letterhead) in written materials concerning the Programs.

123.    Plaintiff relied on these Defendants' negligent and/or reckless misrepresentations and omissions and thereby entered into the LMIC W/C Programs and Arch W/C Program, purchasing tens of millions of Letters of Credit to support the Captive LLC Cells, providing those letters of credit to Prism, providing Corporate Guarantee Agreements, and paying significant monthly premiums directly to Prism based on invoices submitted by Prism, all upon the incorrect belief that Plaintiff was purchasing ownership interests in the Captive LLC Cells or otherwise entering a profit-sharing arrangement.

124.    Defendants' negligent and/or reckless misrepresentations and/or omissions caused Plaintiff to potentially suffer tens of millions of dollars in damages, including millions of dollars used to purchase irrevocable letters of credit, monthly multi-million dollar "premiums and fees"

far in excess of market rates, and exposure to significant ongoing liabilities contingent on actions by third parties.

125.    Accordingly, these Defendants' fraud against NHA has caused Plaintiff to be damaged in an amount to be determined at trial, but believed to be at least $12,897,000.23.

<b><u>FOURTH CLAIM FOR RELIEF</u>:<br>BREACH OF CONTRACT<br>(Defendants Prism, Asher Schoor, and Ettie Schoor)</b>

126.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

127.    Starting in or around 1997, Prism entered into Customer Agreements with many NHA Entities, in which Prism agreed to provide, in exchange for a large fee, "comprehensive claims management services on a regular basis" to the NHA Entity that was signatory to that respective agreement.

128.    The NHA Entities have adequately performed its obligations pursuant to the Customer Agreements.

129.    Prism and the Schoors, however, have breach the Customer Agreements by failing to provide "comprehensive claims management services on a regular basis," as required under the agreement.

130.    Specifically, Prism and the Schoors have not provided NHA with any reports regarding claims against NHA, nor have they helped NHA decrease its premium costs and total loss experience.

131.    Moreover, Prism and the Schoors has caused NHA to post millions of dollars in the form of irrevocable letters of credit, in breach of the Customer Agreements.

132.    Accordingly, these Defendants' breach of contract have caused Plaintiff to be damaged in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF:**
**BREACH OF FIDUCIARY DUTY**
**(Defendants Prism, Asher Schoor, and Ettie Schoor)**

133.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

134.    At the time of entering into and throughout the life of the LMIC W/C Program and Arch W/C Program, Defendants Prism, Asher Schoor and Ettie Schoor held themselves out as representing the interests of Plaintiff.

135.    Defendants Prism, Asher Schoor and Ettie Schoor had a fiduciary duty to their principals, the Plaintiff. These Defendants held themselves out as both representing the interests of Plaintiff, and as being trusted experts in alternative insurance plans, especially insured profit-sharing structures like the Programs.

136.    As part of that fiduciary duty, Defendants Prism, Asher Schoor and Ettie Schoor had an obligation to accurately describe the Program and the Plaintiff's ownership interests in the Captive LLC Cells and to not omit material facts regarding the same.  Further, these Defendants had a duty to correct any material understanding held out by Plaintiff that they knew to be incorrect, including that Plaintiff was not acquiring any ownership interest in the Captive LLC Cells or otherwise entering a profit-sharing arrangement as a part of the Programs.

137.    Defendants Prism, Asher Schoor and Ettie Schoor knowingly, or at least negligently or recklessly, made false statements to Plaintiff regarding their ownership in the Captive LLC Cells and right to profit-sharing under the Programs.

138.    Alternatively, Defendants Prism, Asher Schoor and Ettie Schoor knowingly, or at least negligently or recklessly, omitted the material fact that Plaintiff would not have any ownership in the Captive LLC Cells nor otherwise have a right to profit-sharing under the Programs.

139.    Defendants' misrepresentations and omissions caused Plaintiff to potentially suffer tens of millions of dollars in damages, including millions of dollars used to purchase irrevocable letters of credit, monthly multi-million dollar "premiums and fees" far in excess of market rates, and exposure to significant ongoing liabilities contingent on actions by third parties.

140.    Indeed, some of the amounts that Prism has reported to, and billed and collected from, NHA as having been owed by NHA under the LMIC W/C Program do not relate to workers' compensation insurance risks of the NHA Entities, but rather to other insureds that are not affiliated with NHA or any of the NHA Entities.

141.    Accordingly, Defendants Prism, Asher Schoor and Ettie Schoor's breaches of their fiduciary duty have caused NHA to be damaged in an amount to be determined at trial, but believed to be at least $12,897,000.23.

### SIXTH CLAIM FOR RELIEF:
### UNJUST ENRICHMENT
### (All Defendants)

142.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

143.    Since December 2004, Plaintiff has paid tens of millions of dollars in premiums under the Programs.

144.     Since December 2004, Plaintiff has purchased and provided tens of millions of dollars in Letters of Credit to support the Captive LLC Cells.

145.     Plaintiff made these payments because it believed that it had ownership interests in the Captive LLC Cells or had otherwise entered into a profit-sharing arrangement.

146.     Defendants have been enriched at Plaintiff's expense.

147.     Specifically, Defendants have been overcharging Plaintiff for insurance premiums and fees under the Programs and using Plaintiff to fund collateral and operating expenses for the Captive LLC Cells, in which Plaintiff does not have a profit-sharing interest as was previously represented, all for their own benefit and the benefit of other clients.

148.     Upon information and belief, some of the amounts that Prism (acting on its own behalf and the behalf of LMIC) has reported to, and billed and collected from, Plaintiff as having been owed by Plaintiff under the LMIC W/C Program do not relate to workers' compensation insurance risks of the Plaintiff, but rather to other entities that are not affiliated with NHA.

149.     It is against equity and good conscience to permit Defendants to retain the benefits of Plaintiff's payment of the insurance premiums, fees, and purchase prices for the Letters of Credit in addition to the rewards of profits obtained under the reinsurance structure.

150.     Plaintiff is entitled to be made whole for amounts expended in paying insurance premiums, purchasing letters of credit, and interest forgone as a result of the same.

151.     Accordingly, Defendants must restore to Plaintiff an amount to be determined at trial.

**SEVENTH CLAIM FOR RELIEF:**
**RESCISSION**
**(All Defendants)**

152.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

153.    The LMIC and Arch W/C Programs paired approved LMIC and Arch "guaranteed cost" policies with non-approved captive reinsurance agreements.  Both the approved LMIC and Arch "guaranteed cost" policies were filed with and approved by the New York Department of Financial Services.  However, the non-approved captive reinsurance agreements caused the workers' compensation insurance rates to deviate from those that were approved by the New York Department of Financial Services for the LMIC and Arch "guaranteed cost" workers' compensation policies.

154.    Pursuant to New York insurance laws and regulations, all workers' compensation insurance rates must be filed and approved by the New York Department of Financial Services, and workers' compensation insurance carriers cannot deviate from approved rates.

155.    The modified rates imposed by the Programs' captive reinsurance agreements were not approved by the New York Department of Financial Services.  Moreover, because the rates charged pursuant to these collateral agreements were unreasonable, the New York Department of Financial Services would not have approved these rates, even had they been properly filed.

156.    Because the LMIC and Arch W/C Programs violate New York insurance laws and regulations in a scheme to perpetuate fraud on Plaintiff, all agreements entered into pursuant to these Programs should be rescinded, including all Letters of Credit and Corporate Guarantee Agreements, and Defendants should be enjoined from enforcing them.

157.    Additionally, any premiums, costs and/or fees charged by the Defendants should be refunded, any money remaining in the reinsurance cells should be returned, and Defendants

should be enjoined from collecting or billing for any further amounts claimed under the terms of the LMIC and Arch W/C Programs.

## EIGHTH CLAIM FOR RELIEF:
### ACCOUNTING
### (All Defendants)

158.    Plaintiff realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 97 above.

159.    As a client of Prism, and as the holder of LMIC and Arch insurance policies, NHA is entitled to inspect all of the relevant books and records of Prism, LMIC and Arch, and Prism, LMIC and Arch are required to permit such inspection.

160.    Prism and the Schoors, each of whom owe fiduciary duties to NHA have refused to provide NHA with Prism's complete and unadulterated books and records relevant to the NHA policies.

161.    NHA does not have an adequate remedy at law.

162.    As a result, NHA is entitled to access Prism's complete and unadulterated books and records relevant to the NHA policies, including without limitation information regarding the money collected from NHA and the allocation of those funds.

## PRAYER

WHEREFORE, Plaintiff prays for relief and requests judgment as follows:

A.    As to the First Claim for Relief, damages of at least $12,897,000.23 for letters of credit purchased by Plaintiff during the course of the Programs and punitive damages.

B.    As to the Second Claim for Relief, damages of at least $12,897,000.23 for letters of credit purchased by Plaintiff during the course of the Programs and punitive damages.

C.      As to the Third Claim for Relief, damages of at least $12,897,000.23 for letters of credit purchased by Plaintiff during the course of the Programs and punitive damages.

D.      As to the Fourth Claim for Relief, fees paid by Plaintiff pursuant to the Customer Agreements, at an amount determined at trial, and punitive damages.

E.      As to the Fifth Claim for Relief, premiums and fees paid by Plaintiff during the course of the Programs, damages of at least $12,897,000.23 for letters of credit purchased by Plaintiff during the course of the Programs, and punitive damages.

F.      As to the Sixth Claim for Relief, premiums and fees paid by Plaintiff during the course of the Programs, damages of at least $12,897,000.23 for letters of credit purchased by Plaintiff during the course of the Programs, and punitive damages.

G.      As to the Seventh Claim for Relief, premiums and fees paid by Plaintiff during the course of the Programs, damages of at least $12,897,000.23 for letters of credit purchased by Plaintiff during the course of the Programs, and punitive damages.

H.      As to the Eighth Claim for Relief, a full accounting from Defendants, including but not limited to any and all documents relevant to the captive programs.

I.      As to All Claims for Relief, (1) all costs incurred in bringing this action, including reasonable attorneys' fees and costs; (2) pre-judgment and post-judgment interest; and (3) such other, further and different relief as the Court may deem just and proper, including, but not limited to, rescission of all Letters of Credit and Corporate Guarantee Agreements.

Dated:  September 7, 2017

/s/ Christian T. Becker
Jerold Oshinsky (joshinsky@kasowitz.com)
Christian T. Becker (cbecker@kasowitz.com)
Jeffrey Ephraim Glatt (jglatt@kasowitz.com)
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
(212) 506-1700

*ATTORNEYS FOR PLAINTIFF*